On October 2 at 18791, the L.U. Incorporated, doing business at Village Auto and One-Stop Shop, LLC, in Elmendorado, LLC, Plaintiff's Appellants, v. Heritage Crystal Clean, Inc., and its operating subsidiary, Heritage Crystal Clean, LLC, defendant's appellant, arguing on behalf of the plaintiff's appellants, Mr. Jason P. Steele, arguing on behalf of the defendant's appellants, Mr. Craig S. Young. Mr. Steele, if you're ready, you may proceed. Well, I changed my mind. Mr. Steele, you have to go sit down. I hope not that much, but I'll put him over there. Good morning, Madam Justices. My name is Jason Steele. I'm here with some of my colleagues from my client, Heritage Crystal Clean. May it please the Court. We are here today on the appeal of a decision to certify a nationwide free class, three nationwide classes, broken down by three separate clauses of action. A breach of contract class, a Illinois consumer fraud nationwide class, and an unjust judgment class to only the holding company, Heritage Crystal Clean, Inc. As we lay out in our papers, there are two standards of review here for the Court to consider. Any matters where the Court misapplied the law, the Court may review it de novo. Where we are asking the Court to review the decision asking for certification, it is abuse of discretion. There are four, as we lay out in our briefs, there are four overarching problems with what the Court did below. Many other sub-issues, but the four overarching problems are as follows. First, the Court's first priority below was to consider, as it did twice on motions of dismiss, whether or not the plaintiffs could even state a cause of action individually. As the Court found twice on the motions of dismiss, they cannot. But didn't you just file an answer? We did. It still weighs within the purview and the obligation of the trial court, however, Your Honor, to review at class certification stage whether or not a cause of action has been stated. In fact, the Barber Sales Court in 2007 said, quote, it is axiomatic in considering the propriety of a class action that the Court first determine whether a cause of action has even been stated. Well, you didn't file, in other words, you didn't file a motion to dismiss the third amended complaint. That's correct. You simply filed an answer. And if, I mean, to be blunt, Your Honor, at some point, you can only keep your head against the wall so many times that the courts can allow them to re-plead and re-plead. You've got to move on, otherwise we'll waste time and resources. And so I knew that the Court had the same obligation of the motion of class certification as it does of the motion of dismiss. And so we keep it up there as well. And we're hopeful and believe that the Court there did not find that there's no cause of action stated. So even though we have an answer on file, you want us to look at that as a 615-type assessment? I think that's right. I guess that's not, I don't want you to. I think it's the obligation of this Court as well to, as I said, it's axiomatic. So I think it's an obligation of this Court as well to first consider whether or not a cause of action has been stated. Well, you raised affirmative defenses, too. Correct. And I want to point that out, too. Mr. Mielke identified, and for some reason it's not on my docket, they did file answers to our affirmative defenses. And so he's provided that to me. And obviously, to the extent that's part of our argument, we withdraw that, although I think it's one of, like I said, I was going to say it at the end, but I think I identified 87 reasons why this Court can reverse. I have 86 now. So I can come back to the cause of action. I was going to lay them out all. The second is I think the Court improperly inquired and resolved issues as to the merits, which this Court reviews for abuse of discretion. I think it's relatively clear from the record, abundantly frankly, that individual issues predominate across all three classes, but just generally as to the piety of class action at all. And then finally, we've pointed out in both our opening brief and our reply that I am not aware, and I know that both parties struggle to find a clear, directly on point example of where a Court has certified cause of action in classes. And I think there's a reason for that, and I can get into that as well. So let me begin with the cause of action, because as I said, I think it is the place we begin. I have, for the life of me, struggled. I did it at the motion-to-smith stage. We did it at the class certification stage to figure out what is the term of the contract that they claim was breached. And frankly, I don't think they've ever identified it, and I can't find it. The Court below never identified it in its opinion. And I think this is the place the Court must start here when writing and drafting its opinion, as to whether or not there is even a contract and what the terms of that contract are. Well, as I read the briefs and looked at the record, which was way bigger than your two binders there, it seemed to leap out at me that they were saying, and maybe I'm wrong, and we'll fix it here if I am, that the contracts were in each of the invoices that were tendered and paid, but something was added to it after the discussions, and that was what was called a fuel charge, an energy charge, a surcharge. It had several different names. And I guess the gist of their argument, as I saw it, was that was never discussed and therefore maybe not a breach but an excess of the contract they agreed to. So I think your last statement is the place to focus, because an excess of is not a breach, right? That's, in fact, what I would argue and what would also make this case fail, and I think why they dance around this issue so much, is if we're talking about a term that's breached, that's one thing. But if we're talking about a new term that's added later that was never discussed, well, that's a modification of an existing contract, I would argue. And that modification, theoretically, if that's what they're stating, happened after the initial contract. So now we have a new contract that happened on site between a sales representative and an individual customer, which dooms the predominant question here before this court. But, frankly, I'm not sure that, well, I think what your honors pick up on is our position, the defendant's position, which is the contract by its own terms includes all invoices and work orders. So, you know, back to the first term of the service agreement, which is what starts the relationship between the parties, says we're going to come out, and I'm sure your honors know the facts, I won't repeat them too extensively, but essentially what our company does, there are these big tubs, and they have sinks on them for the most part, and they go and they place them into a garage, and they wash parts, like engine pieces, and so they get the oil off, and they end up having this kind of wastewater that every 12 weeks or so they come out, they either exchange the whole barrel, or they'll top off, so they'll kind of switch out the liquids. So the service agreement says that. It says every 12 weeks for, let's say, $200 interval, we come out, we bring you a new barrel, we change out your oil, or oil and water, and you pay us $200. That's all the service agreement says, mostly. Although, as you point out, and I can talk about, for example, one of the plaintiffs here, one of their service agreements actually has the fuel surcharge identified on the service agreement as well, on the fourth iteration of their service agreement. But for the most part, they just lay out what the actual service is going to be. What happens next is, and to be clear on that too, that first service agreement serves as the first work order as well. So when they show up, they actually drop off the barrel, and they leave. They do not charge a fuel surcharge on the first service agreement slash work order. So the first invoice that goes out will only have that $200 charge. Twelve weeks later, for our service agreement, you come back out to, pick one of these, to Adelphia. And when we get out there, we say, hey, how are things going? What else can we do for you here today? Nothing? Great. Here's your new barrel, $200. Here's our work order that has a fuel surcharge on it for our distance travel, for our attempt to get here. And sign off and say you agree to these charges. Do you agree? Yes. Great. We take that, go back to our branch, which we have 88 of across the country. That branch then processes it, takes it up to the mother ship here in Elgin. And then the invoice issues. The customer reviews the invoice. And if they're okay with it, they pay it. So now the customer has twice reviewed, accepted, and paid. But some customers have not wanted to pay that. Is that correct? That is true. It will occur that some customers can – I can get to that next. So let's say, in that example I gave, I'm your service rep. I come out and I see you and you say, I don't want to pay the service charge, the $200. I don't want to pay the $200. I don't want you to switch out my barrel. I'll pay $50 if you just switch out my water. Okay. Service rep crosses off $200, writes in $50, and leaves. The fuel surcharge might still be on there. So you say, you know what, I don't want to pay the fuel surcharge. Service rep says, okay, crosses off with a pen the fuel surcharge. And so now the invoice that started off as $200 will now go back to the branch. And it will say, $50 top off, no surcharge. That document goes back up to the mothership and invoice issues. And the invoice now is for $50 rather than the $212 or whatever it would have been had we followed our contract and our work order as originally drafted. Each time – and again, this happens every 12 weeks. We're 100,000 customers, 80 branches across the country. Each time that happens, that's the interaction that can occur. And so, as we point out in our predominance, you can imagine the discussions that happen. Because it's not just about that service or the fuel surcharge, but it's also, you know what, I don't want this barrel anymore. I want two smaller barrels. And so sometimes they don't change the service agreement. They just change the work order, and then they go forward. So there are literally thousands of iterations of what may happen the minute I leave the customer base or whatever they told you they want to have happen. And so I've got a little bit off the topic, but I guess what that comes back to is, what's the contract here, right? And what's the contract with each individual? What the plaintiff actually says in their complaint is, the contract is the service agreement and the service agreement only. That can't be. It just doesn't make any sense. So what we would say is, and what the contract says, is it's all of these documents. And if it's all of these documents, then every interaction becomes important and it dooms the class action. So the service agreement plus the work orders is your position. Yes, Your Honor. And like I said, the Term 1 on the back of the actual written agreement says that. This document, along with invoices, work orders, and other relevant work documents are all incorporated into the service agreement. Okay, so we don't know what the contract is. At least it's not clear from the arguments of the law or the court's decision. Without the term, then I don't know what the breach is. If I don't know what the breach is, I'm not sure I still understand what the damage is. And as we point out, and I think the law is clear in Illinois, the damage for a breach of contract is part of the benefit of the bargain, right? What did I expect to get and what did I get? And as we point out to the court below, when you're looking at these transactions, we may have a discussion and you say, I'm willing to pay $200 for that service. I may ask this justice, and she says, I'll pay 1E. I may ask E, you'll say, I'll do the 210, but I don't want to pay the fuel charge. All three of those scenarios can happen for exactly the same service. There is no one-size-fits-all, despite what the plaintiff would state. It's just not true, and it's not what the record supports. But our issue here is the, and I'm going to use the word because I'm not sure, the addition of the fuel charge, the energy surcharge, whatever. Sure. That's the issue that's in question here. I think that's how the plaintiff would frame it, but I think it is myopic to view it as just the only issue here, because this isn't like I'm just bringing you something and you pay me a fuel surcharge. This is a contained transaction that has multiple facets to it that are all in play. It's almost like levers on a sound board as to what a customer will pay for our individual transaction. So, yes, are we talking about the fuel surcharge? Absolutely. When it occurs, how it occurs, in what circumstances it occurs, and where, varies tremendously across the country. What does the fuel surcharge represent? The fuel surcharge, and again, I would argue that this gets to the merits, and so I think it's an improper decision to court me a blow that I was going to talk about, but the fuel surcharge represents the cost to my client. Well, I guess it depends on the year. So for pre-2005, it was a flat fee meant to recover the cost, the additional cost of fuel for my client. Post, I'm sorry, 2005-2012. Post-2012, my client followed what all of its competitors do, which is safety cleaning, waste management. All the people in the class have sued across the country already. And what it represents is the cost, the diesel, I'm sorry, on-highway cost of diesel fuel set out by the Department of Transportation. All of our trucks are diesel-operating trucks, and so what our client did was first look at the market and how it was tracking. But second, what it did was it went and said, our customers want some predictability. They want to have some idea as to what's going to happen. So we put out a chart, both online and in pamphlets if anybody wanted it, that said, here's how we charge our fuels or charges. And basically it's done by some sort of chart, and I honestly don't know the math. I don't know how it works, but it's based on the Department of Energy's, for our transportation's calculations. And so that's how it was charged. So every period for us, which is, I always screw this up too, we have 13 periods, not 12 months, but 13 periods, it varies. So every time the invoice goes out, someone looks at that, whatever the calculation is, and puts it on the invoice. The person shows up with the invoice, gives it to the customer, the customer can agree or not agree, and then they make it. So that's what the fuel surcharge is for. So the fuel surcharge is, it's not really negotiable, but they will negotiate it. Correct. I mean, it is negotiable. It is a set rate that they can or can't pay. They can choose not to pay, and that happens a lot, including all three of our players in this case. All three of them had someone either didn't have it on their contract or struck it out and did not pay it. So clearly they had the option, the knowledge, and the ability to remove it had they chosen to do so. And, in fact, as we point out, it was kind of ironic that all three of them, post-hiring lawyers to sue us, continue to do business with us and pay the fuel surcharge, which I think is problematic for them to be adequate class representatives. If they don't pay the fuel surcharge, can you proceed after them or say we're not going to service you anymore? No, no, we continue with them. You continue. Yeah. In fact, if they ask, we can permanently strike it from their bill forever. So they have a choice to never see it again. I see that my time is up. Well, let's get to your third point quickly. Okay. So no cause of action for breach of contract, no cause of action for consumer fraud. To that point, Your Honor, no nationwide class action. I don't think it's even a question. They raise cases like the Hall case from the First District. I think this Court is controlled by the Avery decision as well as the International Profit Associates, which is from this district, which held that there is no extraterritorial breach of consumer fraud even when there is a choice of law in a contract. And the reason why, as the International Profits Court held, was because you can't have a breach of contract and a consumer fraud claim with overlapping facts. Otherwise, it's a redundant cause of action. You've got to have something different. So you can't then turn to your contract and say, this is why we need to go outside the state or why we need to bring everybody here. So the International Profit case, I think, dooms all three of them with bringing a cause of action here in this case. Improper merits-based decision, they are laid out part and parcel in our briefs. I think there are 27, 28 specific things that we referenced that the Court said. I don't want to harp on them. I will say, and Judge Finius is an excellent judge, but the first thing he said to us when we stepped in was, this is the first class action I've ever had. And I think there's some reflection of that in his decisions. Not that he wasn't thoughtful, not that he didn't listen to the evidence, but when you see the things that he adopted as far as statements, some of the statements of law are just flat wrong. And some of the facts should not have been decisions made at that level. And what he did by making those decisions is he made it simple, which is fine. You can't do it, you can't make a merits-based decision. He made decisions, for example, that the voluntary payment doctrine doesn't apply. That's just false. It applies. What the Court's cases that the plaintiffs argued about were motion dismiss cases, which is, does it barred at the pleading stage? And the answer is, under Illinois law, no, it doesn't anymore. But it's still a relevant factor. This Court has to consider on what kind of individual variations are there, because each person, as we just talked about, has that ability to argue. It's a fuel searcher. Individual issues I think we've covered. I will point to Your Honor's Mulligan v. QDC case, which I had the honor of arguing and losing as a plaintiff's class action lawyer at the time. That is relevant for this decision on the benefit-of-the-bargain argument. And then the three causes of action, like I said, Your Honor, I'm not familiar with any case that's ever done it in the way that they're doing it. The cases they point to are cases like the Philadelphia Consumer Fraud Act versus a nationwide contract plan. Well, that makes sense, because you're talking about a State-based separate cause of action. Another case they point to, I think, is the Cancel v. State of Chicago case, which had to do with towing and picking up cars. That case also was separate. It was, did your car get towed because you were delinquent? Did your car get left because you couldn't pay the bond? So you had separate factual scenarios that would differentiate people in the class. Here, these are the same people with the same underlying facts. Basically, what I would say is claim-splitting their causes of action, because if you start to play out how this would go at trial, I don't understand how we send notice to these people. I don't understand how they respond to us. And when we actually go and try the case, I'm not sure what happens if you win one or you win two or you win three as to how we separate the damage in this case if someone's opted out or not. So I think there's a lot of procedural issues that come with that. Well, is that our issue here? Do we have to make that determination at this stage in the proceedings? You don't. You all don't have to make that decision. You just have to say that certifying it as is is wrong, because it's just untenable. The idea is to have a superior method to deal with. Basically, the answer is could Adelphia try its case, and the results and proofs of that case apply to everybody, and I think the way they've broken it down, they just can't. So that's my point. I have a question for you. What remedy are you asking for? That there be one class or no class? No class. So the third position or the fourth position is this court has to reverse, because doing it three ways is absolutely wrong. And so we're manned, but I don't think it needs direction. I think the court should redo the class certification for the other reasons we said. So I think the reversal of certification is our remedy here. And then, frankly, I think if the court wanted to, the court could hold, as the court in Avery did, that no cause of action is stated, and therefore could instruct the court to dismiss the case. But if that's not the remedy this Court is allowing to deal with, then certification reversal is absolutely the remedy. If there's no further questions, I know we've gone way over time. You'll have an opportunity to reply if you choose. Thank you. I appreciate the time. All right. Mr. Mielke. Counsel, may it please the Court. Craig Mielke on behalf of the plaintiffs' affidavits in this case, where there's a lot there to talk about. This type of case is the quintessential class action.  But what we see time and time again in business and in the case law here in Illinois is a business owner that doesn't want to increase prices, but wants to get additional profit, and adds a line item on invoices for a fake charge. Well, what is the contract that we're talking about? The contract, by its terms, is both the service agreement, the work order, and the invoice. The class is people that got the invoice with the line item fuel surcharge and paid that fuel surcharge. This is, Jason basically said, their view of the universe is that the fuel surcharge is legitimate. It's the recovery of the additional cost of fuel. It's based on i.fuel costs. Our case is that's false. That's the evidentiary decision in this case. Well, somewhere along the line, each company, Adelphia, whoever it happens to be, goes to Heritage and says, We need this work done, and please do it. Let's talk about it. Is there a document that is signed that reflects the work that you need done on a regular basis? You, the body shop owner, or is this? It would presumably be the invoice. So we're agreeing it's the invoice. Not the first work order plus the invoice? I think that's the contract. But I'm not sure if you really need the agreement. You do for other reasons. But if you get an invoice that has a fake line on it. Why do you say fake? I mean, don't they have to use fuel to get to you? Well, sure they do. In Martin v. Heinhold, as an example, there was the foreign service fee, which had no relationship to anything because it didn't relate to anything. But this does have a relationship. I don't think it does. And I think the proof will be that it does not. Certainly they use fuel. But the concept of a surcharge, the definition of a surcharge, is that it relates to a particular item. So if they want to recover a particular fee, a particular expense, then we believe, and I think the case law supports this, that that expense must, in fact, be related something to the actual costs. And as Jason said, he believes that it's to recover not their fuel costs, their additional fuel costs. Meaning that the record in this case is they started doing this. Would it have no cause of action if this was an additional fuel surcharge? If it weren't? No, I don't think that matters because there are no equations. But you just said it's additional. The genesis was in 2005 when we had a spike in fuel costs. In the history of gas prices, diesel is a roller coaster. They're not reducing this when the gas price of diesel goes down. And, in fact, we believe the evidence is there is no relationship between this charge and their actual fuel costs. And that is the problem in this case. In Martin v. Heinhold, the defendant was hiding additional profits under a foreign service fee. Did a commodity broker have service fees? And did they deal with foreign entities? I'm sure they did, but that line item was fake. And that's the basis of your fraud count, basically. The consumer fraud, and I believe breach of contract, too. Because we get to, and this is cited in the brief, it's a strange name, S-37 Management v. Advanced Refrigeration. There the defendant was adding a, quote, government processing fee, which they told people this relates to our compliance costs with all these federal regulations we have to deal with, which may be true for a refrigeration company and that type of thing. But, in fact, the court, I believe that was the first district, upheld both the consumer fraud claim and the breach of contract class in the S-37 Management case. What about the fact that the Department of Transportation is doing this calculation based upon fuel costs and that they're using this calculation, as we just heard? But it doesn't actually relate to that. I mean, any particular customer, the distance that truck has to travel to that customer might be a half a block or 20 miles. I mean, if they really wanted to pass through the fuel costs, it's a whole lot more complicated than just the pump price of diesel. I mean, they have a route, they visit multiple customers. There's no relationship to the actual fuel costs and the fuel surcharge. And, again, that's an evidentiary issue. That's why I think it's ironic that, based on the Avery case, I think we're probably all familiar with the Avery State Farm location. That went to a jury trial. And, in fact, the Supreme Court never considered whether there was a cause of action. The quote from the Illinois Supreme Court is that plaintiffs failed to present adequate evidence to prove their cause of action. And here we believe the evidence will be that this is a bank charge that bears no relationship to their actual fuel costs. And, again, that's a matter of proof. And I understand your factual issues. How is it that this should be a class? Well, the touchstone of any class action is what happens when it goes to trial. I've actually had the privilege and the huge disappointment of trying a class action in Cleveland against Ford Motor Company. We won the first time, got a $1.5 billion verdict. So what are you doing here? They got reversed on appeal. We tried it a second time and we lost. So let's try a class action. I wouldn't be here if we collected $1.5 billion from Ford Motor Company. Can you try the class members case and either establish a right of recovery for other class members or resolve an important issue for other class members? So here the question is what does the fuel surcharge mean and is there evidentiary support for, as Jason said, it's really our recovery of fuel costs or is it, as plaintiff says, merely additional profit? I mean, certainly what we claim is the honest thing for Heritage Crystal Clean to have done is to put a line item on their additional profit. I'm old enough to remember when Mazda Miatas came out, which I think was probably the 70s or 80s. They were very hot cars that were being sold for above list price and the dealers that complied with the window sticker got a line item, additional profit, $2,500. You want to get a hot new Miata convertible? You got to pay for it. And that's perfectly legit. But here that's not what Heritage Crystal Clean did and most importantly, this is kind of like Lee versus Allstate, yes, there were discussions between sales reps and customers and it's as Jason told this court, nobody told any customer that the real purpose of the fuel surcharge was additional profit. And that was the issue in Lee versus Allstate, in part, where we claimed, and that was before this court, I think I argued that 15 years ago. So what you're telling us, if they had actually said instead of fuel surcharge, additional profit, we wouldn't be here. Correct. Or at least not on this issue. I don't think we would be here if they were. What do you make of the fact that people are negotiating this away or if they don't pay it, they're still doing business with you? Sure. Does that have any impact on this? No. Because the people that did pay it, it was a deceptive charge. I don't think whether some paid it and some didn't. I think we see that in some of the case law, too. But it doesn't really impact. If you didn't pay it, then you're not part of the class. You didn't suffer damages for that transaction. No one ever paid or didn't pay that surcharge based on what we believe the true facts are, which is that it was additional profit. And that was one of the issues in Lee versus Allstate. It's actually an issue in all these cases. Any of these consumer class actions, whether it's Martin versus Heinvolk, P.J.'s Concrete, et cetera, the defendant always claims, hey, we had a whole lot of individual interaction with our customers, so therefore the individual issues predominate. But in every single one of these cases, the sales reps never told the customers what we allege to be the truth, which is this is additional profit. So, yes, there are individual proof issues out there, but it doesn't have anything to do with this matter as a cluster. Can an individual customer at this time go above your designated sales rep and ask somebody else what this is? I suppose they could. But our understanding, the proof is that, again, Lee versus Allstate, Allstate, somebody up there knew what the truth was, but they were telling their sales rep, here's the party line. In this case, it's very clearly the party line. Even their lawyer is saying that's what we did. It's on their website. I mean, we know what their claims are. And if their claims are correct, then we lose. But if we're correct that this is nothing but additional profit and this bears no relation to their actual field costs, then we win. And I think clearly this is the quintessential class action, where you get uniform language, a uniform charge, relatively small amounts. I mean, I think individual class numbers, depending on if it's a five- What do you suspect your class membership would be? Do you have any indication? Thousands. I think there is an exact number out there. We've had full discovery with all production from Heritage Crystal. We've got all the computer printouts. And we believe it's very clear the number of people in the class and who paid and who didn't pay. Again, I think there's some dispute on that. That's one of the reasons why this is an abuse of discretion standard, because class certification is apparently a preliminary decision. The trial court, separate and apart from what this court may do, the trial court at any time can reconsider the certification. I hear they have issues why there's three classes. The trial court at any time could get rid of one or two of those classes, could consolidate this to a single class. How we try this case, the trial management, is going to be a big issue in any class action. There's a lot of decisions that even the trial judge is going to have to make that may ultimately determine how this proceeds. I have a question for you. Sure. How will these hundreds or thousands of customers opt into one class or another? They don't opt in. They would opt out. All right. On what notice, what information do you give them to decide which of the three classes to opt out of? First, we haven't gotten to what the class notice is going to look like. That would be a process, an adversarial process in the trial court where we would propose a specific class notice. Defendants would probably reject for various reasons. The typical class notice is very vanilla sounding. It would say that plaintiffs have brought a case against the defendants. The complaint is typically available nowadays on a website, which is cited in there. The court has certified three classes, and it would describe the classes probably somewhat similar to the language in the class certification order. And then the individual recipient's class numbers would be pulled. They can opt out of one or all of the classes, and there's typically a form that they would have to fill out, mail in, and go online. Nowadays, a lot of the stuff is done online. We usually do this with the assistance of a claims or class administrator who would also give us some input on what the notice should look like. But it would all be done in a manner where the parties, the court, and the class administrator attempt to be clear and transparent and not attempting to bias the case one way or the other when they notify the class numbers. All right. We spent a fair amount of time on individual defenses. What's the issue, or why don't you believe there are individual defenses for even the three of you sitting here? Right. I mean, because I don't think there are actual issues. Every class action defense attorney knows very well, I'm going to try to muddy the water by having all these affirmative defenses. The Voluntary Payment Doctrine is one of their favorites, and they claim because of that you can't certify the class because individual issues predominate. Almost universally, the courts reject that for good reason. But here, there's a couple of reasons, like with the Voluntary Payment Doctrine. As in Lee v. Hall State and a lot of other cases, nobody ever told the class members what we believe to be the truth. We also heard from Jason that, well, certainly the named class representatives continue to pay this fee even after the lawsuit was filed. Well, let's sit back here a moment and look at how does the Voluntary Payment Doctrine, where does that come from? Historically, it was a taxpayer suing a taxing body saying, I got my real estate bill, I paid it in full, I didn't pay it under protest, now I want to claim the library district improperly levied or dominated these taxes. So the court said to protect the government entities and the taxpayers in general, if you don't pay your tax bill under protest, you have voluntarily paid and you can't go to court and sue. Here, we found a lawsuit. I can't imagine paying under protest any more firmly and loudly than suing somebody, saying these charges are illegitimate, and then, of course, we keep on paying them. We're paying them under protest. There is clearly no voluntary payment by class representatives that continue to make payment after the lawsuit is filed. That's turning the Voluntary Payment Doctrine inside out. All right, let's talk. I have a question about the three classes. Why do we have three classes? What's their purpose? I think it could have been one class. There's no problem with three classes. They are different. The unjust enrichment class is only against the parent corporation. There's different statute limitations between the contract class and the consumer fraud class. I can envision, after this goes back to the trial court, there's going to be massive summary judgment motions. There's different legal issues, and the court might dismiss out on summary judgment in one of the three classes. So I think we're going to go through that process before we notify and send those out to the class. I mean, the court can limit the number of classes, and it could, at some point throughout discovery, say, this should not be a class action, correct? Absolutely. And they do that frequently or have done so. Yeah. I mean, you can try a case, and in the middle of the trial, the judge says, not class action, sorry, guys. I made a mistake. Now you're trying a case for the 500 bucks for your individual plaintiff. That can happen. No more of those billion-dollar verdicts. Maybe that was the fourth case. I'll have to look it up. Yeah. Is this being used? I mean, you just said if one of the classes happens to fail, you're protected with two others. I mean, is that a legitimate purpose of a class? You know, is it one class with three subclasses? Is it three separate classes? I'm not sure. That's not a distinction without a difference there. I think it can be handled with an appropriate notice. And if, when we start sitting down with the court trying to figure out the notice, and we realize this is not going to be easy to notify people, maybe we make it into one class. Is the establishment of three classes a merit-based decision, or is it a class procedural decision? Because that's where we are right now. We're not making, as Mr. Steele's, we shouldn't be making merit-based decisions. Yeah, it's not merit-based. I think it's a prophylactic in case we do get into some merit issues in the future. So we have to get into that in our decision. We don't. If this case isn't settled someday and we go to trial, I'm sure we'll do that here. We have a related case doctrine. I'm only around for five years, so don't worry. The fourth case went on for 12. Any other questions? Thank you, Counselor. Mr. Steele. Thank you. The labs, I try never to do that while opposing Counselor Craig for a bit. So I try not to, but it's funny to hear it's a distinction without a difference. Because that's why we're here. I mean, if it had been one class and three subclasses, that's a whole different discussion than having them in three subclasses. But you would still be here. Oh, for sure, I'd still be here. But I think it's wrong. I think the decision was wrong, as I said, for 86 now reasons. Well, let's talk about that one because that was the last. Sure. What if what's wrong with three classes if this is a matter of, it's supposed to be a matter of convenience for all, it's supposed to be a matter of efficiency for all. So if we designate three classes and one of them really isn't a solid class, we still have two and we can still go forward and we're not stuck with ending this major litigation with a $500 plan. Sure. So I think let's start with what I think Justice Jorgenson was asking, and I think which is the how do we do it, right, what does it look like. And Craig told you process, but what he didn't tell you was substance. And I think that's the key because picture yourself as a class member who receives a document as Craig described, but what does it say? You're in a breach of contract class. What does that mean? What's your contract? Was there a breach? What was their causation? What are you asking this layman to look at to make a decision they fit in a breach of contract class versus a consumer fraud class? Would you send out three separate notices? I don't know. Would he? I mean, it is the obligation if it was certified as a plaintiff to send it out, but I don't know. And so his point is we can go back down and hash that out. That's not the way this works. It's true that court can revisit at any time, but it's got to be right in the first place, right? We can talk. If we had not appealed it, we could be discussing with the judge down there why this is wrong, but we didn't appeal it because it's wrong on its face. And that's all this court has to figure out. Are there other things that could have done better? Maybe. I don't think so. But that's not the question. The question is, was it wrong? And it is. So that's really the only question that this court needs to answer. All right. So not to get into all the minutia that we were discussing. Apollo would be done. Just as it is, it's not tenable, and that's our point. You know, this trial management concept, you know, I've written on it. I think, honestly, the way the world should work, if I had my brothers, is when plaintiffs file class actions, they should tell us how are you going to try this thing and what's the notice look like? Because once we get that in front of a judge, when he sees it, that kind of tells you what the painting is going to look like when we're done, right? How is this going to go in front of him? How are your proofs going to enter? How is the notice going to go out? Those are things that should be in front of this judge to make his or her decision, down below in this case, his. And so how does that work? Did they not do that in this case before the judge? They did not. In fact, as we point out in their reply, in their responses when we could have filed they actually changed the class again on us, keeping people out and adding people in. So it was a moving target, and it continues to be a moving target. And I think that's why it was because, as Your Honors identified, there are a lot of unique issues here that have to be continued, or they're continually in flux. Well, Justice Jurgensen asked you, I thought, what your goal was, what are you asking for. Well, what if one is one of our options? Okay, trial court, these three classes make no sense. We agree with you there is a class action. Now do something about it. If we made that decision, I'm not sure. Yeah, no. First I say don't make that decision. Do we have all the information? I don't believe you do. And that's the point. And I don't even think, I don't want to overstep my statement here, but I'm not even sure it's within your purview of doing that. I think your kind of confines are did you do it right and reverse. It's up to the trial court and their discretion to reassess and do it again if they think it's the appropriate way to do it. Again, my point is it wasn't this particular moment tonight. I want to clarify a couple of things. One is that this idea that we didn't reduce our costs when diesel goes down, that's obviously not true because it's tied to the Department of Transportation. So when transportation costs go down, our fuel surcharges go down. That's just the way the trial court works. Well, I saw somewhere in the many documents as low as $10, as high as $19. They vary. Did it ever go beyond $19 or go under $10? Not that I'm aware of, Your Honor. I mean, I think, I shouldn't say that. I think there were actually times when they were cut five or something. I don't think. I don't want to overstate the records. I don't know. Have they ever been just removed? Holistically? Well, you're talking about a 12-week period. Yeah. You send out the invoice. You go through the process. That one has a fuel surcharge. The next one has no fuel surcharge. Has that happened? Not. Well, first of all, I guess, let me be clear. So from prior to 2012, it depends, is the answer. Because in different regions, we didn't charge it to someone. So after 2012, we had a standardized chart. So it varied based on that. You've got a couple minutes. Thank you. I only have a couple more points. I think Craig made a pretty good admission is the wrong word. But what he mentioned was, and this is his words, it would be a whole lot more complicated if we actually looked at the fuels and costs to each plaintiff. That's the point, right? Because if let's go, let's talk about what the trial looks like. They say we're lying to everybody. These aren't our fuel costs. Well, then how are we going to determine that? Do we look at how much it costs for my guy, my service rep, to drive to Adelphia and service him? Okay, well, then do we have to do that for 100,000 customers? What's the actual fuel costs that we're talking about here? Well, isn't the compilation or computation of fuel charges consistent pursuant to your chart? It is for predictability for our customers, and that's why we do it that way. But I think what they're arguing is that's not right, right? That's not tied to our actual costs, which means you'd have to go look at our actual costs for each person, which, of course, would be in the class action. You made the comment that we should put additional costs. It's not true. I know your honors have seen it. We don't do things by a cost-plus basis, which means we don't go look at what these cost us and then charge one item by item. What we do is say how much does it cost us to get to market, and then we have this fuel, as Greg mentioned, fluctuating greatly during this period, and so how are we going to try to track that? And if you look at some of the documents that are in the record, there literally is a chart every month that tracks our fuel costs to the fuel surcharge, and it literally follows like that, and it's in the record. The chart moves. When do you pinpoint the charge for this customer on this date? The previous period. So we assess what fuel costs were for us in period one, and when invoices go out for period two, it's based on that. It's the previous period. Right, but that period is more than one day. Correct. How often does the Department of Corrections do better? Do you sometimes feel like you're there? No. I apologize. I know. I understand. The Department of Transportation puts out its calculations in a chart. Correct. Is that chart monthly, daily, quarterly? Well, I don't know. I apologize. But you take the figure given to you by the Department of Transportation in this period because that's when the service took place, but you're billing in, obviously, the next period. That's correct. And I think we, as a company, we do it at the beginning of a period, so whatever it says on that date, that's the information we use. And the last thing I wanted to say here, and it's important, that they referenced the quintessential, and it always happens in the LEED case and the PGA's case. All of those cases had very specific fees laid out in the contract as to what they were. For example, in the LEED versus Allstate case, it was called the COI, and it literally said in the contract, here's how we calculate the COI. We look at the race, we look at your age, and then we go and we do these calculations. There is nothing in this case. We don't tell anybody about how we charge it, and we don't have to. If you look at the other decisions, more like our case, the Deere case, the Maurer case, out of circuit, but more relevant factually, you can say whatever you want to. We call it the elephant in the sky. If we don't describe it, there's no deception. And so with the PGA's case, the LEED case, and the S-37 case, the PGA's case is a great one. In the PGA's case, they said, we're charging you a city utility tax. And that was, by law, they were allowed to pass it on. The city had a tax that they would have for their constituents. Well, what happened in that case is you had people living in a zip code that was a city zip code, but were in an unincorporated area. And so there was no tax to be charged. So it was a flat-out lie. You can't take money from those people and call it a city utility tax. There's foreign services. There was no foreign services. And the S-37 was a government processing. There was no government processing. Here, it's fuel surcharge. It is tied to fuel, as your Honor has pointed out. So I think that in those cases, there are not enough points. And unless there are any other questions, I would, again, ask the Court to reverse the decision and remand. Thank you, Counsel. Thank you all for your time. Thank you. Thank you very much, gentlemen, for your very interesting arguments. We will take the matter under advisement. We are now going to stand in adjournment for today.